BARRY J. PORTMAN
Federal Public Defender
JEROME E. MATTHEWS
Assistant Federal Public Defender
555 - 12th Street
Suite 650
Oakland, CA 94607-3627
Telephone: (510) 637-3500

Counsel for Defendant ARRINGTON GREEN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-08 00045 DLJ |
| Plaintiff, | ) ) | **ARRINGTON GREEN'S SENTENCING MEMORANDUM** |
| vs. | ) ) | **Date: July 11, 2008** |
| ARRINGTON GREEN, | ) | **Time: 10:00 a.m.** |
| Defendant. | ) ) | |

## 1. Preliminary Statement

In 2006, Arrington Green had started to turn his life around. He had obtained a job with a janitorial service that permitted him to work at night, leaving the mornings free to take his mother to work, take his sons to school, and take his grandmother who suffers from Alzheimer's disease to his aunt's house. He devoted what free time he had to his twin sons, trying to guide them because their mother took no part in their lives. In sum, he had achieved a measure of stability in his life.

Things deteriorated when his employer was killed in a motorcycle accident and Mr. Green was unable to find another job. To make matters worse, his aunt died suddenly and his

1   cousin was murdered.  Family members noticed that he had become visibly depressed.  He began

2   to abuse painkillers and unfortunately turned to selling small amounts of drugs to support

3   himself.

4        On February 4, 2008, Mr. Green appeared on a two-count indictment charging him with

5   distribution of cocaine base.  Only two months later, he pleaded guilty to both counts of the

6   indictment without challenging the government's case by motion or otherwise.  On July 11,

7   2008, he will stand before the Court for sentencing under two provisions of the Sentencing

8   Guidelines that have drawn especially sharp criticism from the federal bench, one of them having

9   drawn biting criticism from the Sentencing Commission itself: the crack guidelines and the

10  career offender provision.  Collectively, these Guidelines provisions have generated a wealth of

11  legal challenges, empirical research, legislative hearings, Sentencing Commission revisions and

12  scholarly debate.  Neither of these provisions can be honestly reconciled with 18 U.S.C.

13  §3553(a), and neither should control the sentence in Mr. Green's case.  For these reasons and

14  those that follow, Mr. Green respectfully requests that the Court sentence him to seven years.

15  **2. Background**

16       This case arose from a narcotics investigation in Richmond.  Ironically, the investigation

17  was directed towards someone named "Rodney," not Mr. Green.  When a confidential informant

18  drove into Mr. Green's neighborhood looking for Rodney, she learned that Rodney was

19  elsewhere and she decided to attempt to purchase rock cocaine from Mr. Green.  The informant

20  ultimately made two purchases from Mr. Green: one of 9 grams and the other of 4.4 grams.  Mr.

21  Green was arrested on a federal warrant on February 4, 2008.

22  **3. Comments on the Pre-Sentence Report**

23       ¶ 6.  This paragraph suggests that the operation was designed to conduct a controlled

24  purchase from Mr. Green.  In fact, the target of the investigation was someone named "Rodney,"

25  not Mr. Green.

26       ¶¶ 36, 37.  The probation officer assigns one point each to these misdemeanor driving

SENTENCING MEMORANDUM            2

1    offenses. These convictions were submitted by the government and not included in the draft pre-

2    sentence report. It appears that these convictions were suffered on the same date, July 2, 2001,

3    and there is no evidence of an intervening arrest. As such they are counted as a single sentence

4    under USSG §4A1.2(a)(2). It also appears that Mr. Green was arrested for being a felon in

5    possession of a firearm on June 5, 2001, and sentenced on July 2, 2001. PSR, ¶ 35. It is not

6    clear whether there was an intervening arrest between the misdemeanor driving offense(s) and

7    the felon in possession of a firearm offense. If not, §4A1.2(a)(2) could operate to render all three

8    convictions related for purposes of computing criminal history.

9              ¶¶ 42, 43. It is not clear that Mr. Green's criminal history is Category VI.

10   **4. Sentencing Recommendation**

11                                             **I.**

12                        <u>**The Components of A Reasonable Sentence**</u>

13          *United States v. Booker*, 543 U.S. 220 (2005), directs the sentencing court to impose an

14   appropriate sentence, unencumbered by offense levels, criminal history, or the availability of

15   authorized downward departures. Under the post-*Booker* discretionary sentencing regime, there

16   is no longer any question that the advisory Guideline range is only one factor among several that

17   this Court is required to consider in determining what constitutes a reasonable sentence. The

18   Court is free to disagree with Guideline ranges and policy considerations. *See Kimbrough v.*

19   *United States*, 128 S.Ct. 558, 57 (2007). While circuit courts of appeal may apply a presumption

20   of reasonableness to sentences within the applicable Guidelines range, *Rita v. United States*, 127

21   S.Ct. 2456 (2007), the district court "does not enjoy the benefit of a legal presumption that the

22   Guidelines sentence should apply." *Id.* at 2465. Nor is it required to use a formulaic approach

23   yielding a mathematical justification of non-Guidelines sentences. *Gall v. United States*, 128

24   S.Ct. 586, 596 (2007). Rather, it must exercise "reasoned sentencing judgment, resting upon an

25   effort to filter the Guidelines' general advice through § 3553(a)'s list of factors." *Rita*, 127 S.Ct.

26   at 2469.

1    Sentencing discretion, therefore, is not a hollow term of art. The courts of appeal are

2 limited to reviewing sentences for abuse of discretion and may not presume that a sentence which

3 may be much lower than that suggested by the Guidelines is unreasonable. *Gall*, 128 S.Ct. at

4 597. To the contrary, *Gall* emphasized the importance of deferring to the judgment of the

5 sentencing courts, explaining:

6    The sentencing judge is in a superior position to find facts and judge their import
     under § 3553(a) in the individual case. The judge sees and hears the evidence,
7    makes credibility determinations, has full knowledge of the facts and gains
     insights not conveyed by the record. "The sentencing judge has access to, and
8    greater familiarity with, the individual case and the individual defendant before
     him than the Commission or the appeals court."

9

10 *Id.* at 597-98 (quoting *Rita v. United States*, 127 S.Ct. 2456, 2469 (2007)).

11    18 U.S.C. § 3553(a), the wellspring from which a reasonable sentence must be drawn,

12 "contains an overarching provision," *see Kimbrough*, 128 S.Ct. at 570, directing the district court

13 to impose a sentence that is "sufficient, but not greater than necessary, to comply with" the

14 purposes of sentencing. Section § 3553(a) (emphasis added). Those purposes include the need:

15    •    to provide just punishment;

16    •    to create adequate deterrence;

17    •    to protect the public; and

18    •    to provide the defendant with necessary treatment and training.

19    Section 3553(a)(2).

20    In sum, "th[e] mandatory system [embodied in § 3553(b)] is no longer an open choice,"

21 *Booker*, 543 U.S. at 263, and the district court's duty is to impose the least amount of time

22 necessary to achieve § 3553(a)'s purposes. The Guidelines range is subordinate to that duty.

23    For a number of reasons, Mr. Green believes that a sentence of seven years is sufficient

24 but not greater than that necessary to meet the directives of 18 U.S.C. §3553(a).

25

26

## II.

## A Sentence of Seven Years is Appropriate in This Case

### A. A Sentence of Seven Years is Just Punishment

(1) The crack/powder disparity justifies a below-guidelines sentence.

Mr. Green accepts responsibility for possessing crack cocaine with the intent to distribute it, and stands ready to suffer the consequences. Those consequences are harsh.

Congress, at long last, seems to grasp this. Senators Joseph Biden and Orrin Hatch, and Representative Charles Rangel individually have sponsored legislation to either equalize or reduce the disparities between sentences for powder and crack cocaine: S. 1711 and H.R. 460 would set a single mandatory minimum at the current powder cocaine levels and eliminate the five-year mandatory minimum for simple possession of crack cocaine; S. 1685 would increase the amount of crack cocaine necessary to trigger the five-year mandatory minimum from 5 to 25 grams, and the ten-year mandatory minimum from 50 to 250 grams.

The federal bench has long voiced dissatisfaction with the crack guidelines. The Judicial Conference's Criminal Law Committee helped persuade the Sentencing Commission to make the recently enacted crack guidelines amendments retroactive. U.S. District Judge Paul Cassell's letter to the Commission, dated November 1, 2007, stated in no uncertain terms the Judicial Conference's "view that the disparity between penalties for powder cocaine and crack cocaine is not supportable and harms public confidence in the federal judiciary."[1]

The debate engendered by the crack-powder disparity is now, it appears, evolving into something resembling a consensus that both the relevant statutes and sentencing guidelines are grotesquely unfair. In *Kimbrough v. United States*, 128 S.Ct. 558 (2007), the Supreme Court declared that "the crack/powder disparity produces disproportionately harsh sanctions, i.e,

---

[1] Available at:
http://sentencing.typepad.com/sentencing_law_and_policy/files/clc_letter_re_crack_retroactivity.pdf.

SENTENCING MEMORANDUM 5

1  sentences for crack cocaine offenses 'greater than necessary' in light of the purposes of

2  sentencing set forth in § 3553(a)." 128 S.Ct. at 675.  *Kimbrough's* declaration is now finding its

3  voice in the courts of appeal.  In *United States v. Medina Castenada*, 511 F.3d 1246, 1248 (9th

4  Cir. 2008), for example, the district court rejected the defendant's request that it consider the

5  powder/crack disparity in determining his sentence.  *Medina Castaneda,* 511 F.3d at 1248-49.

6  The Ninth Circuit remanded and directed that the district court reconsider the defendant's

7  sentence "in light of the *Kimbrough* decision and to determine whether the disparity between

8  crack and powder cocaine produced a sentence 'greater than necessary' under § 3553(a).  *Id.* at

9  1249.  *Kimbrough* and *Medina Castenada* each confirm that the crack/powder disparity is a

10  relevant factor to consider under § 3553(a).

11          Apropos of this disparity, the court in *United States v. Barsumyan*, 517 F.3d 1154, 1159

12  (9th Cir. 2008), observed that "[i]f the operation of one particular guideline has inappropriately

13  distorted the final range calculation, that is one factor which the district court may take into

14  account in determining the final sentence."  Here, the crack cocaine guideline, as compared to the

15  applicable powder cocaine guidelines, distorts the final calculation.  Were Mr. Green to be

16  sentenced under the 1:1 ratio recommended by the Sentencing Commission, the base offense

17  level would be 12, based on 13.4 grams of cocaine.  *See* USSG § 2D1.1(c)(14).  The resulting

18  guidelines range, even assuming Criminal History Category VI, would be 30 to 37 months.  Mr.

19  Green is not asking for such a sentence, but is instead requesting a sentence that would be well

20  above what he would face based on powder cocaine.[2]  A sentence of seven years, based in part on

21  the powder/crack disparity, would ensure that the sentence was based on the nature of the offense

22  and would adequately deter criminal conduct.

23

24      [2]      Mr. Green's status as a career offender would set a default offense level of 32 and
25  Criminal History Category VI, based on the offense statutory maximum for distributing 13.4
    grams of cocaine powder, namely 20 years.  Even as a career offender, however, Mr. Green
26  would "only" face 151 to 188 months upon a guilty plea. As discussed *post*, the Career Offender
    provision also distorts the range of punishment in Mr. Green's case.

SENTENCING MEMORANDUM            6

1           (2) <u>The career offender provision is inconsistent with § 3553(a)</u>.

2       The career offender guideline range is both extraordinarily severe and markedly unlikely

3 to promote sentencing purposes prescribed by the guidelines. *See* USSC, *Fifteen Years of*

4 *Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is*

5 *Achieving the Goals of Sentencing Reform*, at 133-34 (2004). A bit of background is necessary

6 to see why this is so.

7       The genesis of the career offender provision is 28 U.S.C. § 994(h), which suggests that

8 career offenders be sentenced near the statutory maximum. By its terms, the statute is directed to

9 the Sentencing Commission, not the courts. The Senate Report explained that it "was added to

10 the bill . . . to replace a provision . . . that would have mandated a sentencing judge to impose a

11 sentence at or near the statutory maximum for repeat violent offenders and repeat drug

12 offenders." S. Rep. No. 98-225 at 175 (1983). The Sentencing Commission, however, rather

13 than employing an empirical approach[3] to the career offender provision by examining past

14 sentencing practices, instead keyed the offense levels to statutory maximum sentences. USSG

15 §4B1.1(b)(A) - (G).

16       The government has argued in other cases that a sentence below the career offender

17 guideline range based on the reasoning in *Gall* would nullify § 994(h), but the argument has not

18 been well-received. In *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008), affirming a 91-month

19 downward variance from the career offender guidelines, the court found the argument to be

20 "wide of the mark. The Supreme Court's recent decision in *Kimbrough*, 128 S. Ct. at 574-75,

21 opened the door for a sentencing court to deviate from the guidelines in an individual case even

22 though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing

23 Commission." *Id.* at 96. As the Second Circuit trenchantly has observed, "Congress did not

---

25      [3]     The Supreme Court noted that it was "fair to assume" that a guideline range
"reflect[s] a rough approximation" of sentences consistent with §3553(a)'s objectives because

26 the Commission had taken an empirical approach, i.e. examining past sentencing practices, in
formulating many of the guidelines. *Rita*, 127 S.Ct. at 2464-65.

1  intend § 994(h) to deprive the courts of authority to impose on a career offender a prison term

2  that is not near the statutory maximum." *United States v. Sanchez*, 517 F.3d 651, 662-65 (2d Cir.

3  2008); *see also United States v. Boardman*, 528 F.3d 86, 87 (1st Cir. 2008) (remanding to permit

4  district court to consider sentence below the career offender guidelines).

5         The foregoing makes clear that the career offender guidelines – more often than not, and

6  most certainly in Mr. Green's case – do not consist with, much less advance, the goals of

7  §3553(a). Here, the career offender guidelines increase Mr. Green's total offense level from 21

8  to 31. At Criminal History Category VI, this translates to an increase from a guidelines range of

9  77-96 months to 188-235 months. In other words, Mr. Green faces a sentence at least nine years

10 higher because of the career offender classification. Application of this classification will

11 "inappropriately distorted the final range calculation," *Barsumyan*, 517 F.3d at 1159, and the

12 Court accordingly should impose a sentence that more appropriately reflects the directives of

13 §3553(a).

14        Mr. Green is caught in the crossfire from two draconian guidelines provisions: the

15 crack/powder disparity as exacerbated by the career offender provision. Each provision, standing

16 alone, suggests an unduly harsh sentence; together, they result in a potential sentence that simply

17 is not supportable.

18             (3) <u>Mr. Green has shown himself capable of rehabilitation.</u>

19        Mr. Green made an honest and dedicated effort to rehabilitate himself upon his release

20 from prison. As Sheila Harris, Mr. Green's mother, describes in a letter to the Court, Mr. Green

21 came home determined to make a better life for himself. He experienced the frustration of

22 having his criminal history severely limit his prospects for employment, but persisted until he got

23 a job. He cared for his relatives and involved himself in the lives of his children, who had been

24 adversely affected by the absence of a mother who couldn't be troubled to care for them. His

25 parole records reflect that he kept in constant contact with his parole officer, did well on his job,

26

SENTENCING MEMORANDUM              8

1    and, except for two positive drug tests, complied with the conditions of his release.[4]

2    Had he not lost his job following the death of his employer, fate may have written a

3    different outcome.  Mr. Green's depression, however, got the better of him and he again began

4    abusing painkillers.  The consequences of Mr. Green's addiction to painkillers cannot be

5    overstated.  After being shot in the arm at age 20, Mr. Green began using Valium, Vicodin and

6    other codeine-based drugs on a daily basis and in amounts up to 500 milligrams.  PSR, ¶¶ 49, 51.

7    He was in fact clearly under the influence at the time of the charged offenses.  A video recordings

8    of one of the charged transactions shows Mr. Green, glassy-eyed and unsteady, speaking almost

9    incoherently to the informant.

10    Mr. Green nonetheless is optimistic about his future.  He presently is working on

11    obtaining his GED, and, as the letters from family and friends attest[5], he can draw from the

12    support of those close to him.

13    For all these reasons, Mr. Green asks that the Court impose a sentence of seven years.

14    **D. A Sentence of Seven Years Will Create Adequate Deterrence**

15    Mr. Green has only one prior prison sentence, and that sentence resulted from an assault

16    conviction.  He has suffered no subsequent convictions or arrests involving firearms, and the

17    Court may presume that his prison sentence has adequately deterred him from possessing

18    firearms.

19    He previously served 210 days for a drug offense.  A sentence of seven years therefore is

20    twelve times as long as any previous punishment for a drug offense, and two years more than the

21    sentence imposed for his assault conviction.  Further, a seven-year sentence, when considered in

22    conjunction with the more intensive supervision employed by the U.S. Probation Office, creates

23    an environment sufficiently restrictive to deter Mr. Green from re-offending.

24

25    _____

[4]    A copy of his parole records is attached as Exhibit A.

26    [5]    Copies of these letters are attached collectively as Exhibit B.

SENTENCING MEMORANDUM                    9

1

**E.  Protection of the Public**

2       The requested sentence similarly will protect the public.  Mr. Green is not eligible for

3  probation and will not be released back into the community for a substantial period of time.

4  During that time, he will have access to programs and counseling, and be better equipped to

5  address and deal with the issues that have caused problems in his life.

6       **F.  A Seven-Year Sentence Will Permit Necessary Treatment and Training**

7       Mr. Green's substance abuse problems are acute.  His participation in RDAP, the

8  Residential Drug Abuse Treatment Program offered by the Bureau of Prisons, will permit him to

9  overcome a persistent pattern of substance abuse.

10  **4. Conclusion**

11       For the reasons stated, Arrington Green respectfully requests that the Court impose a

12  sentence of seven years.

13

14  Dated: July 3, 2008

15                              Respectfully submitted,

16                              BARRY J. PORTMAN
                                Federal Public Defender
17

18                              JEROME E. MATTHEWS
19                              Assistant Federal Public Defender

20

21

22

23

24

25

26

SENTENCING MEMORANDUM                    10

# Exhibit A

**U.S. v. Arrington Green**
**CR-08 00045 DLJ**

STATE OF CALIFORNIA
RECORD OF SUPERVISION
CDC 1650D (Rev 8/96)

DEPARTMENT OF CORRECTIONS

**TYPE OF CONTACT**

\* RECORD ONLY FACE TO FACE CONTACTS WITH PAROLEE.

CDC NUMBER: T98739
PAROLEE'S NAME: Dreen Arrington
AGENT OF RECORD: K. Stansbury
PAROLE OFFICE: Richmond

A DATE AND TIME ENTRY IS REQUIRED ON ALL CONTACTS

| DATE | TIME | |
|---|---|---|
| 12/14/06 | | S in unit office for initial interview. See CDC 1650-B. |
| 12/14/06 | 1830/1845 | AOR saw "S" at the ROR. Mom said she is glad "S" is home and she will help him find a job. |
| 1/2/07 | 1005 | "S" called and said he has a job as a painter. He will get the info and give it to AOR tomorrow. His supr is Mike (510) 932-3832. He works from 1700-2400 and his cell # is (510) 472-1538. Start 1/1/07. |
| 1/3/07 | 1200/1215 | AOR saw "S" at the ROR and ANT was observed. GF said "S" got a job as a painter and she is glad because the money will help them out. "S" showed AOR his prescription for HYDROCODONE 500 QU. |
| 3/1/07 | 1830/1845 | AOR saw "S" at the ROR and ANT was observed. Mother said "S" is doing fine and is still working. |

STATE OF CALIFORNIA
**RECORD OF SUPERVISION**
CDC 1650D (Rev 8/96)

DEPARTMENT OF CORRECTIONS

**TYPE OF CONTACT**

\* RECORD ONLY FACE TO FACE CONTACTS WITH PAROLEE.

| CDC NUMBER | PAROLEE'S NAME |
|---|---|
| T-98739 | GREEN, ARRINGTON |
| AGENT OF RECORD | STANSBURY |
| PAROLE OFFICE | RICHMOND |

A DATE AND TIME ENTRY IS REQUIRED ON ALL CONTACTS

| RESIDENCE | JAIL | EMPLOYMENT | OFFICE | CELL PHONE | ATTEMPTED CONTACT | COLLATERAL | ANT DATE/RESULT | OUTSIDE (Home, Work, etc.) | CASE REVIEW | DATE | TIME | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | X | | | | N / X | | | 4/4/07 | 1330 | "S" came into the office and ANT was observed. "S" said he went to the doctor and was given the following meds: Oxycodone 10mg. |
| X | | | | | | X | | | | 4/9/07 | 0700 / 0715 | AOR ran "S" at the ROR. Mom said "S" is doing fine and is looking for job because the other one is gone. AOR referred "S" to Walmart. |
| X | | | | | | X | N / X | | | 4/12/07 | 0730 / 0740 | AOR ran "S" at the ROR and ant was observed. Mom said "S" is doing fine and is still looking for work. |
| | | | | | | | | | X | 6/25/07 | | Case Assigned to Agent Stansbury This Date. AO |
| | | | | | | | | | X | 7/10/07 | | C/S Case Review 180 Days Case Review Date was Due 3/07. Case has been supervised at the incorrect supervision. The CII indicates on service by the VS as High Control, but previous AOR most been |

**CASE REVIEW**



STATE OF CALIFORNIA
RECORD OF SUPERVISION
CDC 1650D (Rev 8/96)

DEPARTMENT OF CORRECTIONS

TYPE OF CONTACT

* RECORD ONLY FACE TO FACE CONTACTS WITH PAROLEE.

| | |
|---|---|
| CDC NUMBER T-98739 | PAROLEE'S NAME GREEN, ARRINGTON |
| AGENT OF RECORD Stewart | PAROLE OFFICE RICHMOND |

A DATE AND TIME ENTRY IS REQUIRED ON ALL CONTACTS

CASE REVIEW

DATE | TIME

8/10/07 - cont'd - supervised os C/S. Since subject's release he has not suffered any violations. All C/S req's have been completed. Supervision level will remain at C/S since no documented violations, however if S suffers any violations he will be supervised at H/C. Next case review 1/08.

STATE OF CALIFORNIA
RECORD OF SUPERVISION
CDC 1650D (Rev 8/96)

DEPARTMENT OF CORRECTIONS

\* RECORD ONLY FACE TO FACE CONTACTS WITH PAROLEE.

| CDC NUMBER | PAROLEE'S NAME |
|---|---|
| T98739 | GREEN, ARRINGTON |
| AGENT OF RECORD | PAROLE OFFICE |
| C. STEWART | II RICHMOND |

| TYPE OF CONTACT | DATE | TIME | A DATE AND TIME ENTRY IS REQUIRED ON ALL CONTACTS |
|---|---|---|---|
| OFFICE: X | 7/1/07 | 2:10 | A H.V. A O R AT "S" RESIDENCE OF RECORD, NO ONE HOME H O R LEFT CARD. C. Stewart |
| FIELD: X | 7/7/07 | 11:40 11:50 | H.V. A O R AT "S" RESIDENCE OF RECORD "S" HOME WITH HIS GRAND MOTHER AND MOTHER H O R TALKED WITH "S" GRANDMOTHER ABOUT "S" GETTING EMPLOYMENT AND BEING A POSITIVE EXAMPLE FOR HIS CHILDREN. RESIDENCE APPEARS TO BE STABLE. C. Stewart |
| OFFICE: X | 7/9/07 | 11:10 | PAROLEE REPORTED TO UNIT OFFICE, ANT TEST OBSERVED. "S" WAS GIVEN A JOB REFERRAL. C. Stewart |
| OFFICE: X | 9/6/07 | 9:00 | PAROLEE REPORTED TO UNIT OFFICE, "S" STATED THAT HE IS LOOKING FOR A FULL-TIME JOB WITH BENEFITS. ANT TEST OBSERVED. C. Stewart |
| FIELD: X | 9/30/07 | 12:10 2:15 | H.V. H O R AT "S" RESIDENCE OF RECORD, "S" HOME WITH HIS COUSIN. "S" STATED THAT HE HAS BEEN GOING ON INTERVIEWS, AND HE IS HOPEFUL THAT HE WILL BE SUCCESSFUL IN GETTING THE JOB. RESIDENCE STABLE C. Stewart |
| OFFICE: X | 10/3/07 | 10:15 | PAROLEE REPORTED TO UNIT OFFICE, "S" STATED THAT HE HAS A PROMISED JOB WITH U-PS. ANT TEST OBSERVED. C. Stewart |

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS
RECORD OF SUPERVISION
CDC 1650D (Rev 8/96)

| TYPE OF CONTACT | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

\* RECORD ONLY FACE TO FACE CONTACTS WITH PAROLEE.

CDC NUMBER: J38916

PAROLEE'S NAME: GREEN, ARRINGTON

AGENT OF RECORD: C. STEWART

PAROLE OFFICE: II RICHMOND

| DATE | TIME | A DATE AND TIME ENTRY IS REQUIRED ON ALL CONTACTS |
|---|---|---|
| 11/6/07 | 0945 | PAROLEE REPORTED TO UNIT OFFICE. "S" STATED THAT HE IS EXPERIENCING SOME PROBLEMS FINDING FULL-TIME WORK BECAUSE OF HIS BACKGROUND - AOR ENCOURAGED "S" TO STAY POSITIVE. ANT-TEST OBSERVED - E. Stewart |
| 11/27/07 | 2:00 2:10 | H.V. AOR AT "S" RESIDENCE OF RECORD "S" HOME WITH HIS AUNT AND UNCLE, WHO WAS VISITING FROM OUT OF TOWN. "S" STATED THAT HE WAS STILL TRYING TO GET A FULL TIME JOB. RESIDENCE STABLE - E. Stewart |
| 11/30/07 | 3:15 3:35 | H.V. AOR AT "S" RESIDENCE OF RECORD, "S" WAS PLACED ON EID FOR A PERIOD OF 45 DAYS. E. Stewart |
| 12/4/07 | 1:00 | PAROLEE REPORTED TO UNIT OFFICE, "S" STATED THAT HE WAS STILL LOOKING FOR STABLE AND FULLTIME EMPLOYMENT. ANT TEST OBSERVED - E. Stewart |
| 12/20/07 | 3:00 3:10 | H.V AOR AT "S" RESIDENCE OF RECORD, "S" HOME WITH HIS GRANDMOTHER AND AUNTS AND UNCLE, WHO WERE VISITING FROM STOCKTON. RESIDENCE STABLE. E. Stewart |

STATE OF CALIFORNIA
**RECORD OF SUPERVISION**
CDCR 1650-D (Rev 06/07)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
DIVISION OF ADULT PAROLE OPERATIONS

## * RECORD ONLY FACE TO FACE CONTACTS WITH PAROLEE

| CDC NUMBER | PAROLEE'S NAME |
|---|---|
| T98739 | Green, Arrington |

| AGENT OF RECORD | BADGE # | PAROLE OFFICE |
|---|---|---|
| S. Stairston | 4727 | Richmond |

| DATE | TIME | **A DATE AND TIME ENTRY IS REQUIRED ON ALL CONTACTS |
|---|---|---|
| 1/8/08 | 1800 | S in ofc to check in & newly assigned AoR. Photo-updated. Confirmed S ResR. S unemployed but says he will be getting employment next week through referral from his mother. ANT observed. S wearing EID device. Device was scheduled to be removed from S. |
| 1/9/08 | 1630 | Conducted H.V. S home alone. Says his mother is c work @ YMCA. Says he is doing okay. I ask if Device to be removed on 1/14/8. Informed S device would be removed probably on 1/15/08. Toured apt + S' bedroom. |
| 1/15/08 | 1150 | Tk from S. Says device scheduled to be removed. Informed S (AoR) has appt + device to be removed 1/16/08 by Agent Stewart. |
| 1/16/08 | 1100 | Confirmed c Agent Stewart EID removed from S. |
| 1/22/08 | 1520 | Tk to S. Inst S to rpt to ofc 1/22/08 c 1400 . |

**ADA ARMSTRONG ACCOMODATION CODES:**
1=Spoke Slowly/Simple English; 2= Interpretive Services; 3= Hearing Amplification; 4= Written Notes; 5= ASL/American Sign Language; 6= Vision Assistance; 7 = TDD Services

STATE OF CALIFORNIA
**RECORD OF SUPERVISION**
CDCR 1650-D (Rev. 06/07)



DEPARTMENT OF CORRECTIONS AND REHABILITATION
DIVISION OF ADULT PAROLE OPERATIONS

| TYPE OF CONTACT | |
|---|---|
| RESIDENCE / JAIL / EMPLOYMENT / OFFICE / TELEPHONE / ATTEMPTED CONTACT / COLLATERAL / ANT DATE / RESULT / OTHER (I.E. Monthly Report, etc.) / CASE REVIEW / ADA ARMSTRONG ACCOMMODATION CODES | |

**\* RECORD ONLY FACE-TO-FACE CONTACTS WITH PAROLEE**

CASE REVIEW

ENTERED
JAN 23
by [signature]

| CDC NUMBER | PAROLEE'S NAME |
|---|---|
| J38916 | Green, Arlington |
| AGENT OF RECORD Mainstrom | BADGE # | PAROLE OFFICE Richmond |

| DATE | TIME | ** A DATE AND TIME ENTRY IS REQUIRED ON ALL CONTACTS |
|---|---|---|
| 1-23-08 | | Last seen... 10-3-07 ... [illegible handwriting] ... 11/07-1/08 missed ... 3rd FTF in residence ... for 10/07 spoos met for 11/07 ... 12/07 spoos extended ... for 1/08 pay current ... Client good job result ... ANT noted for 1-8-08 ... [illegible] violation occurs ... [signature] |
| 1/23/08 | 1345 | S in as instructed. Informed S of positive ANT result. Directed S to BAON appt scheduled for 14 hrs. S informed he would be required to attend meetings 4 times a week in the evenings. S completed enrollment at BAON card shown ... |
| 2/4/08 | 819 | TC from S mother (Shirlethern) says S arrested by Feds on old warrant. S in defendant ... |

ADA ARMSTRONG ACCOMMODATION CODES:
1=Spoke Slowly/Simple English; 2=Interpretive Services; 3=Hearing Amplification; 4=Written Notes; 5=ASL/American Sign Language; 6=Vision
Assistance; 7=TDD Services.

STATE OF CALIFORNIA
**RECORD OF SUPERVISION**
CDCR 1650-D (Rev. 06/07)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
DIVISION OF ADULT PAROLE OPERATIONS

## TYPE OF CONTACT

## * RECORD ONLY FACE-TO-FACE CONTACTS WITH PAROLEE

| RESIDENCE | JAIL | EMPLOYMENT | OFFICE | TELEPHONE | ATTEMPTED CONTACT | COLLATERAL | ANT DATE / RESULT | DATE (ARMSTRONG REPORT REQ) | CASE REVIEW | ADA ARMSTRONG ACCOMMODATION CODES |
|---|---|---|---|---|---|---|---|---|---|---|

| CDC NUMBER | PAROLEE'S NAME |
|---|---|
| T 98739 | Green, Arrington |

| AGENT OF RECORD | BADGE # | PAROLE OFFICE |
|---|---|---|
| (Horton) | 4727 | R |

| DATE | TIME | ** A DATE AND TIME ENTRY IS REQUIRED ON ALL CONTACTS |
|---|---|---|
| 7/5/08 | 1510 | Tk. from Brad Wilson of Oakland pre-trial services. Mr. Wilson requesting info on S. Sew. Informed for June 2007 offense seeks to undercover. Agt requested rpt noting charges. Mr. Wilson inquired how P chng on parole. Informed Mr. Wilson of S drug use violations. Also noted S got reserve off CID. Mr. Wilson # (510) 637-3951. Sew he will fax rpt. Agt |
| 7/6/08 | | Tk from D. Betts of D.A. after RPD. Sew they are interested putting paperwork together. Agt would receive something today or tomorrow. |
| 2/7/08 | | OBTAIN arrest appvd, submit to BPH. |

| | | CASE REVIEW |
|---|---|---|
| 2/16/08 | 1145 | Tk to Glen Joyce. Said to continue custody. Referenced S. CSRT. Agt |

ADA ARMSTRONG ACCOMMODATION CODES:
=Spoke Slowly/Simple English; 2=Interpretive Services; 3=Hearing Amplification; 4=Written Notes; 5=ASL/American Sign Language; 6=Vision
assistance; 7=TDD Services.

# Exhibit B

**U.S. v. Arrington Green**
**CR-08 00045 DLJ**

Dear Judge Jensen,

My name is Sheila Harris and I am Arrington's mother. I just want to say, the person that stands before you is not all bad. He is a good father and a good son. I know his record shows different, but please believe that there is another side to my baby. When Arrington came home, he got a job with a Janitorial Service. He had filled out numerous applications and was so happy he was finally able to find a job and one that fitted all his needs. I worked in the mornings and he worked at night so we were able to help each other out a lot. He would take me to work, his twin boys to school, and my mother, who suffers from Alzheimer's and unable to care for herself, to my sister's house every morning after he got off work.

Arrington was devastated when the owner of the janitorial service died in a motorcycle accident. He felt as if the one person who had given him a chance to turn his life around was gone and he was back at square one. The company went out of business and Arrington was unemployed again. This took a huge toll on him because it was really hard to find a decent paying job with his record.

Arrington's twin boys Amonte and Devonte are seven years old. Their mother has been in and out of their lives since they were nine months old and I have had custody of them since then. When Arrington came home he dedicated a great deal of time to his children taking them places and doing things with them they had been missing out on because of the absence of him and their mother. He even tried to reconcile with her in an effort to get their family back together again. When that didn't work, he quickly took on the role of mother and father, making meals, going to school programs/conferences, and doing what it took to restore normalcy to their lives while their mother had decided not to be a part of their lives.

I started to notice my son go into a state of depression. He experienced let down after let down. He tried relentlessly to find a job, to no avail; his kids mother wasn't interested in taking an equal share of responsibility for their children; his grandmother was diagnosed with Alzheimer's; his aunt died in his arms from a sudden death due to a ruptured artery in her heart; and his big cousin was murdered. All these incidents occurred in a matter of months and I believe my son was affected by them. I think he resorted to drugs (using and

selling) and the streets as a way to cover the pain and rejection he was feeling. I would try to help him out by giving him a little money here and there when I could. He felt bad taking it but he couldn't afford to turn it down. I guess Arrington decided to try and make money the wrong way and now it has cost him his freedom. My son is not some BIG drug dealer, he just made a BIG mistake.

Your Honor, I am asking that you please be lenient on my son. I know he broke the law and I know he must pay for that. All I'm asking is that you don't take him away for a long time. Please allow him a chance at rehabilitation and a chance to right his wrongs. His children need him desperately and they will be the ones who will suffer most from his absence.

Thank you in advance for your consideration in this matter.

Sincerely,

Sheila Harris

Sheila Harris

Dear Judge Jensen,

I am writing this letter in support of my brother-in-law Arrington Green. I am saddened by this horrible predicament he has gotten himself into. While I am a firm believer that *if you do the crime you must do the time*, I also believe your environment and circumstances play a big part in your everyday decision making and sometimes *desperate times call for desperate measures*.

When Arrington got out of prison, he was determined to make a better life for him and his children. We had countless conversations about jobs he applied for and job leads I had given to him. I had never seen him so excited and optimistic about his future.

When Arrington finally found a job he was on top of the world. He bragged about how he had to hurry home to get some sleep so he could pick up his children and mother and go to work. His happiness was short lived due the tragic death of his boss who died in a motorcycle accident. This was just the beginning of a streak of bad luck that Arrington and his family encountered. Arrington tried to move on and resumed his job search but was unsuccessful in finding a decent job with a felony on his record.

Judge, I know you see a lot of young men come through your courtroom whom have made bad decisions and consequently ended up in jail. While I know you have a job to do, I am pleading with you to consider more rehabilitation and less incarceration for my brothers

and sisters who still have hope. I know we are all in control of our own destinies but sometimes we take chances due to extenuating circumstances. Arrington tried very hard to do right.

Please consider the lasting effect a long prison term will have on his two young sons. Please give him a chance to rehabilitate himself so he can become a productive citizen and make sure his sons don't travel down the same road. They need him for guidance now more than ever as these are the years when they learn skills that will help them succeed in life.

Thank You,

Senika Levias

April 28, 2008

To Whom It May Concern:

I have known Arrington Green for three and half years on a professional basis. I have had the opportunity to both engage and interact with Arrington in the Latchkey program his boys attended.

In my interactions with Arrington, I can confirm that he is a man of great integrity, is very dedicated to his family, and is honest. In my experiences with Arrington he has always been respectful, courteous, and willing to help out whenever needed.

Furthermore, Arrington has always proven to be dependable and has demonstrated the ability to avert a crisis and provide support or seek support whether personal or family. Arrington is selfless in giving of himself and always open to helping the next person in need.

For your information, I am a Homeless Services Case Manager who has the opportunity to interact and observe behaviors of various people on a regular basis. Arrington has remained appropriate in his display of behaviors regardless of the situation presented to him and he has always been conscientious about his personal presentation.

Sincerely,

Michelle Wilson

To: Judge

Hi! My Name Is LELA KEYS, I'M ONE OF Arrington's Cousin. WE GREW Up Together . I Taught Him How To Play BASEBAll AN Everything.

Arrington, Has Really Grown To BE A Reasonable Adult AND FATHER. I'M NOT SAYing THAT He Has. Always Made The Right DECESION But, WHO HAS! I KNOW He Realize What He DiD WAS NOT RIGHT, BUT It's So Hard Out Here Being A Single Parent AND CANT GET A Job Because of Your BACKGround. I KNOW Because I'M ONE of Those Single Parents. All Arrington Wanted To Do Is try To HAVE The Best For His Children . Not Really KNOWing What He Thought Was RiGHT WAS Wrong.

So, I Just Ask That Whatever U Decide To Give Him Please Be FAIR AN Think About His Children AND Mother AN My Grandmother BECause Arrington PlayED A BIG PART IN Their LiFE. WE All Miss HiM AlREADY

THANK YOU,
Lela Keys

Hello Im Kalayla, (Orringtons little cousin) Orrington Really is a good person whether people know this or not. Orrington is a family man, Daily hes peking up and dropping off our grandmother, his mother our aunts and his kids. Before my mother passed away he did these things for me and her taking me to school and everything and having talks with me about school trying to direct me in the Right path. The day my mother passed he was there helping her breathe on her own you can tell that her death took a lot out of him but it wasn't in his hands people who don't live in Richmond just don't understand the impact that it has on your life. You wake up Ready to make something of yourself but once you mess up that one time at the end of yoro day you find your just like the Rest of the people in your situation... stuck.

By judging arringtons situation
before you, your only able to see
the mistakes he's made in his life.
But he's much more than the
mistake's he's made on that
paper. He's human and every
human has made their mistakes.
And I only ask that you fairly
judge the ARRINGTON that I
know. The kind hearted family
man who had very little direction
of a roemodel that he wanted to
be like or become.

Yours Truly, Kalayla R.

May 8, 2008

To Whom It May Concern:

My name is Linda Lambie and I am a teacher at Fairmont Elementary School in El Cerrito, California.

This year I have had the pleasure of having Devonte Green in my first grade class. I also know his brother, Amonte Green, as he is in the other first grade class.

I have met the boys' father, Mr. Arrington Green, as well as their grandmother, Mrs. Sheila Harris. Mr. Green not only attended our scheduled Parent-Teacher Conference in November 2007, but also brought the boys to our school's Annual Family Holiday Potluck in December 2007, where the boys performed a song with other first graders.

I have also had chances to speak with him at various times during the school year when he would come after school to pick up his boys. He always seemed interested in their work and their progress in school.

Thank you,

*Linda M. Lambie*

Linda Lambie
Fairmont School
724 Kearney St.
El Cerrito, CA 94530
(510) 525-5235

Dear Judge,

This letter is on behalf of Arrington Green and the impact of a lengthy incarceration. It will cause a great hardship on his children. Arrington was taking care of his twin boys without the help of their mother. And from what I observed, the boys loved him dearly. The boys are now without a mother and father in their life. I realize that Arrington has committed a crime and should be prosecreted. However, please keep in mine the impact of a lengthy incarceration on his 7 year old twin boys.


Uncle,

Isiah Harris

**To Whom It May COncern:**

My name is Paige Levias and I am Arrington Green's only nice. My uncle is one of the many suppoerters in my Grandma's, Shiela Harris, complicated life. Since his recent arrest my grandma has tooken on more stress than usual. He has been a humongous help with her schedule. As you may already know my grandma is the guardian of both Amontae and Devontae Green, which is another big obligation. My uncle presence has always been a positive detail to her life and theirs. For example, he helps take care of my great grandma, Lela Harris, who is 82 years old and needs a great deal of help. Since my grandma is almost aged herself and has been taking care of kids for over 32 years, my uncle could help out now and prevent trauma in my family.

Everyone makes mistakes that are not able to be repaired, but one has to be given a chance to justify their decisions with the ones that love them. Him bein oppressed in a "correctional facility" will only make it harder for him to rehabilitate himself inside and out. I love my uncle more than words can explain, and to see my family, whom I also have so much love for, suffer for his imprisonment kills me inside. And I know it kills my uncle. So please consider his release for the better of my family, especially his kids and mother.

**THANKS,**
Paige A. Levias

TO WHOM THIS MAY CONCERN:

My name is Arrington Levias and Arrington Green is my uncle. My uncle is a good hearted person, he's not perfect for if he was he wouldn't be in his present position. He loves his family with all his heart and helps us out when he's needed. Especially his mother and grandmother. He also helped his mother raise me. For instance, when I was younger he used to take me to different places. I am currently 17, but he still calls to check on me, makes sure I go to school and encourages me to stay on the right path. My uncle adores his kids, which is natural when a man has to be both the father and mother. He would always pick them up from school and play with them and do all sorts of activities with them. He helped his mother, Shiela Harris, and grandmother, Lela Harris, out a lot because his mom is currently taking care of her mother, who is not in a perfect condition, his kids and herself.

When my uncle got out of jail he was working, but his boss had passed in a motorcycle accident. He completed and solicited many applications, but he wasnt getting any responses. We know he's going to have to suffer from his mistakes, but please have mercy on him and give him another chance for the sake of his family and mostly children. Thank you for taking the time to read my letter.

Arrington L. Levias

**YMCA of the East Bay**
**West Contra Costa Branch**
263 South 20th Street, Richmond, CA 94804
(510) 412-5647  Fax: (510) 412-5650

June 27, 2008

To Judge D. Lowell Jensen,

My name is Krystal Barrett, one of Arrington Greens first cousins. Arrington Green compared to other young men is a great father to his children, wonderful son to his mother and an all around great person towards family and friends. Arrington spends a lot of time with his children, which included; taking and picking them up from school, going to every parent conference, and every school activity which he needed to attend and at times he would volunteer at the school where his children attends. Arrington even volunteered his time at my job which is the Coronado Y.M.C.A of the East Bay on October 31, 2007 for our haunted house event which his children participated in. Not to mention, when the weekends would come, he spent the whole entire day with his children. They would go to the park, beaches, movies, out to lunch and or breakfast, and whatever else would satisfy his children. Arrington helped his mother so much with his grandmother, and when he did that, he was helping two people at once. His mother works an eight hour shift, five days a week and also has to take care of her mother. That alone is a lot of work on her. Arrington would step in all of the time by helping his mother out by making groceries, cleaning the house, doing laundry, etc...This is very true about Arrington Green. Everyone has their downfalls and mistakes in life, but when you're a person as wonderful as Arrington, when it comes to his family and making sure that his priorities are taken care of, I feel that you deserve a second chance at life. I know that Arrington has to serve some time, but please don't let his time be to long. His children, mother, grandmother, and the rest of his family is in need of him because he is a help to all of us in his own way. Please take this letter into consideration.

Thank You,

Krystal Barrett

Krystal Barrett

Recreational Specialist

Community Services

*We build strong kids, strong families,*
*strong communities.*

June 27, 2008

Dear Judge Jensen,

  I am writing you on behalf of my nephew Arrington Green. Arrington is a nice, young gentleman and very family oriented .Especially when it comes to his children and mother. Arrington love to play sports and he teaches his children how to play them .He would show them when he would take them to the park, the beach, or even at his children school on the playground when he would go up there. He helps my baby sister, his mother out a lot with his grandmother. Arrington would come to the house to cook and clean without even being asked. That's just the type of person he is. Arrington also attended school parent conference meetings, participate with his children in the school activities, and willingly volunteered  himself at their school. Arrington is a person that has a lot of potential and I wish that the sentence you would give him, is not that long. His children need him to be in their life and also his entire family.

                    Thank You,

                    Dorietha Barrett